## Case No. 172.
### ALEXANDER v. RODRIGUEZ.
[Pamphlet Case.][2]
Circuit Court, D. California. June 1, 1869.[3]

MORTGAGES—DEED ABSOLUTE ON ITS FACE—PAROL EVIDENCE—TRUSTS.

[1. Where a deed, absolute upon its face, is given to secure a debt, equity will enforce

---

[1] Reported by Hon. William Cranch, Chief Judge.]

[2] [Not previously reported.]

[3] [Reversed by supreme court in Villa v. Rodriguez, 12 Wall. (79 U. S.) 323.]

the debtor's right to redeem. irrespective of any agreement or of the intentions of the parties; and parol evidence is admissible to show whether the conveyance was in fact made as such security.]

[2. To establish the fact that a conveyance, absolute upon its face, was intended to secure debt, and should therefore be subject to redemption, parol evidence of an agreement to that effect is insufficient; facts and circumstances must be shown dehors the instrument such as to give rise to an equity paramount to the intention of the parties, or by exhibiting the real nature of the transaction to expose the attempted fraud, and for these purposes parol evidence as to the consideration, the conversation and correspondence between the parties, and every other circumstances, is admissible.]

[See note at end of case.]

[3. A conveyance made in satisfaction of a precedent debt, so that there is no personal remedy left to the creditor against the debtor, cannot take effect as a mortgage, although it contains a clause providing for redemption. Conway v. Alexander, 7 Cranch, (11 U. S.) 218, followed.]

[See note at end of case.]

[4. A widow and her children conveyed to her brother in fee simple a ranch as a satisfaction for and extinguishment of a precedent debt, but under the expectation founded on the brother's assurance that any surplus of the price at which it might thereafter be sold over and above the amount necessary to reimburse him would be appropriated by him to the benefit of the widow and her children. *Held*, that whatever trust was created referred .to the proceeds of such subsequent sale, and did not attach itself to the land, nor in any way impair the brother's right to dispose of it.]

[In equity. Bill by George Alexander against Jacinto Rodriguez, Rensselaer E. Steele, Isaac C. Steele, Edgar W. Steele, and George Steele to redeem certain land which had been conveyed to Rodriguez. Bill dismissed.]

J. B. Harmon and Paterson, Wallace & Stow, for complainant.

Williams & Thornton and Wilson & Crittenden, for respondents.

HOFFMAN, District Judge. This was a bill in equity, filed to redeem a certain estate conveyed to the defendant Rodriguez, by a deed absolute on its face, but alleged to be a mortgage. The general and undisputed facts of the case are as follows:

On the 13th April, 1852, Jose Maria Villavicencia, the grantee of a rancho known as the "Corral de Piedra," conveyed to his children all his right and title in the rancho. His claim had not then been confirmed, but a final decree of a confirmation was subsequently obtained, the lands surveyed, and a patent issued in November, 1867. In 18—, Jose Maria died, leaving surviving him the grantees named in the deed, who were his heirs at law, and his widow, Rafaela Rodriguez de Villavicencia. On the 4th day of December, 1860, the widow and Jose Ramon, Fulgencio, and Ascencion Villavicencia executed to the defendant Jacinto Rodriguez, who is a brother of the widow, a mortgage of the lands, to secure the payment of the

sum of four thousand dollars, with interest thereon at the rate of two per cent. per month compounding semiannually, and for such other advances as might be made by the mortgagee for the payment of any taxes, assessments, or other charges which might be imposed on the land. On the 29th April, 1864, there was due to Jacinto, for principal and interest of the moneys loaned by him, the sum of $8,610, and for moneys advanced to redeem the premises from a tax sale the sum of $1,172.33. As the family was in needy circumstances, and no interest had been paid on the mortgage, Jacinto desired a settlement, which he was further induced to demand by the fact that, under the laws of California, taxes were assessed against the mortgagors upon the value of the land, and against the mortgagee upon the amount of the mortgage. The family therefore determined to convey in fee the premises to Jacinto, which conveyance was executed on the 29th April, 1864, by the widow Rafaela, Jose Ramon, Fulgencio, Ascencion, Jose and Ramona. On the 17th day of February, 1865, Antonio Villavicencia, who had then come of age, and who had full knowledge of the original transaction between the other heirs and Jacinto, executed to the latter a conveyance of all his right, title and interest in the rancho, for the nominal consideration of $100. On the 20th day of May, 1865, Jose Ignacio Villavicencia, with like knowledge of the conveyance by his mother and the other heirs, executed to Jacinto a deed in fee simple for all his right, title and interest in and to the premises. On the 27th July, 1866, Jacinto Rodriguez executed to the defendants Edgar W. Steele, Isaac C. Steele, and Rensselaer S. Steele a lease of the premises, with certain covenants on the part of the lessees for the payment of rent and the erection of improvements, and on the part of the lessor for the conveyance of the title at the expiration of the term for a specified sum.

On the 16th December, 1867, the widow, Jose Ramon, Jose Antonio, Ascencion and Ramona executed to Fulgencio a conveyance of all their right, title and interest in the rancho. This conveyance was made without consideration, and in order that Fulgencio might enter into arrangements with other parties for the assertion of their rights. Fulgencio accordingly, on the 26th December, 1867, conveyed to the complainant all his right, title and interest. The consideration stated in the deed is the sum of thirty-five thousand dollars; the actual amount paid was one thousand dollars; but it was agreed that a further payment of $35,000 was to be made, in case the complainant should succeed in the suit. By what writings this obligation is evidenced, or what security has been given for its fulfillment, does not appear. It is alleged in the bill that the conveyance to Jacinto was executed in order to avoid the double taxation referred to; that

it was intended as a mortgage to secure the payment of the moneys due the latter; and that it was understood that upon repayment of such moneys, with interest, Jacinto would reconvey to the grantors the premises. These allegations of the bill are positively denied in the answer of Jacinto Rodriguez.

The equitable rule which treats every conveyance of land which is in fact a security for an antecedent debt or contemporaneous loan, as a mortgage, which the debtor is entitled to redeem and demand a reconveyance of the estate on payment of the debt, is firmly established in the jurisprudence of both England and the United States. This doctrine is not confined merely to cases where the deed fails to express the real intention of the parties through fraud, accident, or mistake, but it is applied where the parties have attempted, by express agreement, to convert what is in fact a security for a debt into an irredeemable conveyance, or even to qualify in any manner the power of the mortgagor to exercise himself the right to redeem, or to transfer it to another. "The principle is well settled," says Savage, C. J., in Clark v. Henry, 2 Cow. 324, "that chancery will not suffer any agreement in a mortgage to prevail which shall change it into an absolute conveyance, upon any condition or event whatever." An estate cannot at one time be a mortgage, and at another time cease to be so, by one and the same deed. Howard v. Harris, 1 Vern. 190. "Once a mortgage, always a mortgage;" and the grantor may redeem at any time consistent with the general rules or equity, notwithstanding the most express stipulation that the instrument shall not operate, or be considered, as a mortgage; and that, if the money be not paid at a day certain, the estate of the grantee shall be forever absolute. Rankin v. Mortimere, 7 Watts, 372; 3 [White & T.] Lead. Cas. Eq. 624. The inquiry, therefore, whether a deed absolute on its face is to be regarded by equity as a mortgage does not depend so much upon the agreement of the parties as upon the circumstances of the case, and the real nature of the transaction; and whenever it is made to appear, by proof oral or written that the transaction was a loan and the deed given as security for a debt due by the grantor, the latter will, on payment, be entitled to redeem. Morris v. Nixon, 1 How. [42 U. S.] 118; Taylor v. Luther, [Case No. 13,796;] Babcock v. Wyman, 19 How. [60 U. S]. 289; Russell v. Southard, 12 How. [53 U. S.] 139, Jenkins v. Eldridge, [Case No. 7,266;] 3 [White & T.] Lead. Cas. Eq. 625, and cases cited.

The familiar expression that a deed absolute on its face will be treated in equity as a mortgage, if so intended by the parties, is defective as a statement of the doctrine, for the right to redeem is not only independent of the agreement or intention of the parties, but paramount to it, and may be enforced in opposition to the terms of the convey-

ance. "The policy of equity," says the learned author of the American notes to 3 Lead. Cas. Eq. 627, "forbids the creditor to speculate on the necessities of the debtor, by the creation of an unredeemable mortgage, as the policy of the law, though from different reasons, forbids the creation of inalienable estates, in fee or entail. The rule overrides the agreement and intention of the parties, and cannot be evaded by any contrivance which cupidity may employ or necessity submit to." Upon this principle, the whole system of equity, with regard to mortgages, rests.

In the case of the ordinary bond and mortgage, the writings themselves disclose the fact that the relation of debtor and creditor exists, and that the conveyance is a mere security for a loan. When the conveyance is on its face absolute, or in the form of a condition, the same facts may be established by parol; and they are allowed to be proved, not for the purpose of varying or contradicting the terms of the written contract, but to establish the existence of the paramount equity of the mortgagor, by which the operation of the deed is controlled. Babcock v. Wyman, 19 How. [60 U. S.] 289; Russell v. Southard, 12 How. [53 U. S.] 139. "Whether a particular deed, absolute on its face, should be regarded in equity as a mortgage, will depend upon all the circumstances of the case,—the relations between the parties, the object they had in view, the purpose for which the conveyance was executed, the means employed to obtain it, or any other fact or circumstance may be shown, of a nature to control the deed, and establish a right of redemption paramount to and independent of its terms." 3 [White & T.] Lead. Cas. Eq., ubi supra.

The principal evidence on the part of the complainant in this case, is the depositions of the widow and heirs who united in the conveyance. They all assert that the deed was made at the solicitation of Jacinto Rodriguez, and with the understanding that it was to be merely a security for the debts due him from the family. Rafaela states that a few days before the execution of the deed, her brother Jacinto had a conversation with her, in which it was agreed that she and her children should execute a conveyance to him, as a security for the debt due him; that he begged her not to distrust him, and assured her that all he wanted was to secure his money. This conversation she communicated to her children, and on this understanding the deed was signed by them, and also the separate deeds afterwards executed by Antonio, on coming of age, and by Jacinto, who was then absent. The testimony of the other grantors is substantially to the same effect. They all swear to assurances given by Jacinto, that he wanted nothing more than his money, and that the deed was given as a security. Mr. C. W. Dana, county clerk of

San Luis Obispo county, who took the acknowledgments of the execution of the deed by the widow and her children, states that, before the deed was translated and read over to them, the widow inquired of Jacinto if it was in strict accordance with the agreements and understanding between them. Jacinto replied that it was. It was then translated and read in the presence of all the family. The witness also states that in a conversation between himself and Jacinto, on their way back to San Luis, the latter said that his object in getting the Villavicencia family to execute the deed was to secure the money which he had loaned or advanced to them, and to save the property for the benefit of his sister and her family; while, if it remained in their hands, he might lose his money, and his sister and her children would lose the whole property. He said they had done wisely in trusting him, as he intended to deal justly by them. A similar conversation between Jacinto and William J. Graves is testified to by the latter. If its purport is accurately given, Jacinto would seem to have acquiesced in the opinion expressed by Mr. Graves, that the deed to him should be regarded as a mortgage. It is objected that parol testimony as to the motives and understanding with which the instrument was executed, as also evidence of the admission of Jacinto, cannot be received to vary or contradict the terms of the written instrument. In 4 Kent, Comm. 143, it is declared that "a deed absolute on its face, and though registered as a deed, will be valid and effectual as a mortgage between the parties, if it was intended by them to be merely a security for a debt. And this would be the case, though the defeasance was by an agreement resting in parol; for parol evidence is admissible to show that an absolute deed was intended as a mortgage, and that the defeasance was omitted by fraud or mistake." To this Story, Circuit Justice, in Taylor v. Luther, [Case No. 13,796,] adds: "It is the same if it be omitted by design upon mutual confidence between the parties, for the violation of such an agreement would be a fraud of the most flagrant kind, originating in an open breach of trust against conscience and justice." These passages are cited with approval by the supreme court in Babcock v. Wyman, 19 How. [60 U. S.] 299.

But to establish the fact that the conveyance was intended as a mere security for a debt, something more than parol evidence of an agreement to that effect will be required. Facts and circumstances must be shown dehors the instrument, such as will give rise to an equity paramount to the agreement of the parties, or by exhibiting the real nature of the transaction expose the attempted fraud. On such an inquiry, the whole range of parol proofs is open. The relations between the parties; the consideration actually paid; the means employed to obtain the conveyance; the object in making it; the origin of the transaction; whether the parties originally met on the footing of borrower and lender; conversation and correspondence between the parties; and, in general, every fact or circumstance of a nature to disclose the real nature of the transaction. Conway v. Alexander, 7 Cranch, [11 U. S.] 218; Pierce v. Robinson, 13 Cal. 117; Morris v. Nixon, 1 How. [42 U. S.] 132; Russell v. Southard, 12 How. [53 U. S.] 154; Babcock v. Wyman, 19 How. [60 U. S.] 289; Taylor v. Luther, [Case No. 13,796;] 3 [White & T.] Lead. Cas. Eq. 630–633, and cases cited. But when these or similar circumstances are not shown to take the case out of the statute of frauds or the rules of evidence, parol evidence is as inadmissible to show that an absolute deed was made subject to an understanding that it should be redeemable, or that a conditional deed was intended to be susceptible of redemption without strict compliance with the condition, as if it were offered to contradict or vary the instrument in any other particular." 3 [White & T.] Lead. Cas. Eq., ubi supra; [Elliott v. Maxwell,] 7 Ired. Eq. 246; Webb v. Rice, 6 Hill, 219; Cook v. Eaton, 16 Barb. 439; Conway v. Alexander, 7 Cranch, [11 U. S.] 218. In the present case, the evidence under consideration, when taken in connection with the other testimony adduced, is addressed not merely to the contract of the parties. The real nature of the transaction is sought to be exposed by showing the relations between the parties; the ignorance and confidence on one side—acuteness and capacity for business on the other; alleged inadequacy of consideration, and the conversation which occurred, and the inducements held out at the time of the execution of the conveyance. It has been held that the facts out of which the alleged equity arises may be shown by the admissions of the grantee, though such evidence should be received with caution. 2 Black, fol. 101, 4–67. And the motives of the parties, the means employed to obtain the deed, and the purpose for which it was executed, may be shown by the conversation which preceded or accompanied the execution, and which form a part of the res gestae of the transaction. Morris v. Nixon, [1 How. (42 U. S.) 132.] I think, therefore, that the evidence offered is clearly admissible.

Much testimony was taken to show that the consideration given for the land was inadequate. I have attentively considered it, but have not been able to find any satisfactory proof of any such gross inadequacy of consideration as to justify the conclusion that the deed must have been intended as a mortgage, or that undue advantage was taken of the necessities and distress of the grantors. In view of the recent extraordinary rise in the value of lands in the southern portion of this state, it is, no doubt, difficult for witnesses to recall how greatly in 1864, the year of drought, its value was de-

pressed, and how difficult it was to find a purchaser for an extensive rancho. The arguments and representatives made by Mr. Van Ness to Jacinto Rodriguez, when two years later he was endeavoring to induce the latter to sell this very estate, are, unless they were entirely disingenuous and inconsistent with notorious facts, more reliable evidence of what was then, and for two years had been, the value of the land, than any opinion he may now express under the perhaps unconscious influence of the recent advance in values. The fact, too, that Jacinto, who, in any view of the facts of this case, must have desired to have obtained the largest possible price, was able in 1866 to obtain only $20,000, payable at the expiration of five years, is inconsistent with the supposition the lands could have a much greater cash value than the consideration mentioned in the deed. The witness who attaches the highest and in fact the extravagant value to the land is Mr. McReilay, and yet in March, 1866, he communicates, as a friendly office to Jacinto, an offer of $12,000 for the land, and reminds [the latter] that no less than nine ranchos, which he enumerates, are for sale, and that there are no purchasers. The letters of the widow show that she was by no means destitute of intelligence. But the family was illiterate and unfamiliar with business affairs. They were poor, and had no other resources than the rancho, and they felt confidence and affection for their uncle. But these facts, though under some circumstances they might have great weight, are, in my view of this case, of subordinate importance.

The account of the transaction given by Jacinto himself is as follows: He was the holder of a mortgage executed nearly four years previous by the widow and three of the children, for money furnished for their support, and advanced to redeem the land on a tax sale. No interest had been paid, and the indebtedness was rapidly accumulating. He therefore wrote to his sister that it was time to come to a settlement, as the mortgage could not last a lifetime. She told him to come to see her whenever convenient. He accordingly did so, and, finding the family assembled, was told by them that they had consulted together, and were determined to sell him the rancho on account of the money due on the mortgage. They said they had come to this determination, because, if it was put up for sale, some other person would certainly buy it, and they would never get it again; and they preferred that he should finally be the owner because he was the one who saved them on a former occasion when they were about to lose the rancho on another mortgage. To this he replied, that if they were all agreed to sell the rancho, he would accept the proposition with pleasure, and would take no steps to foreclose the mortgage. After some further consultation, and after obtaining from Antonio

a promise to unite in the conveyance when he became of age, he informed them that he would cause the conveyance to be made out, and would bring it to the house for the recorder to take their acknowledgments. They again informed him that they would comply with their agreement. Whereupon he told them that he did not wish to speculate upon them, because they were his relations, and they had treated him well, and that, if he could sell the rancho for enough to reimburse him for his outlays, he would return the surplus, if any; and also, if he could sell a portion of the land for enough to reimburse himself, he would reconvey the unsold portion. But if he had bad luck and could not sell he would lose his money. At the time of the execution of the deed, he informed them that it had been prepared in accordance with what passed in the conversation, and with what they had promised; and he asked if they were willing to sign. They declared themselves ready, and the deed was executed. The witness adds that his offer to restore the surplus of the land, or the price he might obtain, after reimbursing himself, was purely spontaneous, and made after they had agreed to sell.

I have no doubt that this was the true nature of the transaction. It is consistent with the conversations reported by Mr. Dana and Mr. Graves, and it is not irreconcilable with the statements of Rafaela and the family. It is true that they testify that the conveyance was made as a security for the debt due Jacinto. But it is to be remembered that these witnesses testify under the pressure of poverty and interest. Except the insignificant sum of $1,000 already received, their future hopes depend on the result of this suit. They are, therefore, under great temptation to shape their testimony so as to promote their interests,—see opinion of Mr. Justice Campbell in Babcock v. Wyman, [19 How. (60 U. S.) 289,]—and the adoption by all of them of the very phrase of the books, that the deed was given as security for a debt, suggests the suspicion that they have been thoroughly apprised what facts it would be necessary to establish. Both Rafaela and her daughter admit that Jacinto was to endeavor to sell the land, or find a purchaser. They assert, however, that the family were to be consulted, and, if satisfied with the price, to execute the conveyance. It will presently be shown that the family were fully advised of the negotiations with the Steeles, and offered no objection; but the statement that they were to unite in the deed to the purchaser is inconsistent with their own account of the transaction, for why should an absolute deed be made to Jacinto, in order that he might sell and reimburse himself, if the final deed to the purchaser was to be made by themselves?

But the most important corroboration of the testimony of Jacinto is found in the letters written by or at the dictation of

Rafaela. In her letter of March 4th, 1865, she says: "He (one Goldtree) also told me to ask you if you wished to exchange a piece of land of your rancho. He says he will give you, from the road," etc., etc. "I know that you will not like this, but he has pressed me so that I promised to write to you to see if you were willing to do so or no. About the amount I owe him, I said to him that, if he wished the interest I have in the rancho of San Ramon, I would give it to him for that which I owe him." In her letter of March 13th, 1865, she informs him that she, and all of her sons and daughters, had been sued, and the rancho attached, for a debt due to one Buzzolano, and adds: "I do not know if that gentleman will tell you of the attachment or not, but I think, from what some disinterested friends of ours have told us, that there is some trap well laid here, not against me, because I have nothing, but against the rancho, that is against you. * * * I would like to see Mr. Murray, that he may defend our part; but, of course, without your consent, nothing will be done. The fact is that their object, according to my sure and truthful information, is to nullify the sale of the rancho to you, upon the grounds that when that sale was executed the debt had already accrued, or at least that it was about accruing, and under some other requisite. of which we are ignorant, to the end that, in this manner, the debt shall fall upon the rancho. You will see from this that it is of the greatest importance you should come," etc. "I am very much cast down. They seek to collect not only the debt, but the interest." In her letter of July 23, 1866, she says: "I have received your esteemed letter of 22d inst., respecting matters in relation to the rancho,—that Mr. Van Ness has spoken to you of the sale of the rancho, and also of renting. You also tell me that another gentleman, who is a business agent, tells you that he can find a customer to buy the rancho or rent it, paying him his five per cent. commission, assuring you that he can sell the whole of the rancho for $20,000, or rent it for $1,000 per year, the lessee paying the taxes, anu at the end of the term taking the whole of the rancho, if it be convenient for him to do so. You tell me that it is impossible to reserve a piece of land with the house; do not think that I did not know tnis. I have always said that it is impossible for you to find a customer for the sale of the rancho except for the whole. You should do what is most convenient for you. They tell me that there is in San Francisco a gentleman who wishes to buy the rancho, but I have not seen him. I do not know if he be not the same whose agent you say was in this place on Monday last. I wrote you a letter respecting the taxes on the rancho. Cappe sent word to me to write that you should come here to attend the Board of Supervisors. I think you have to pay $500 taxes; and perhaps if you were here

it would not be so much. Don Thomas Pollard desires to rent the ranch to put sheep on it. He told me he would wait two weeks, but I think he went above. It may be that he will go to see you about the rent of the rancho. Answer me whether you will come or not, and what will be the result of all this. Rafaela Rodriguez." On August 8, 1866, she writes: "I have before me your esteemed letter of the 30th ultimo, in which you tell me that you have rented the rancho for five years, at the rent of $1,000 annually, and that the said gentleman has the privilege, at the end of the five years, of buying the rancho at the price of $20,000. If, as you tell me that you had rented the rancho, you had told me that you had sold it, it would have been better than renting it in this manner, because of what use is it for us to occupy the house and sowing grounds for one year. as you have contracted? We cannot plant next year, because when the 1st August comes they will say to us 'Away!' And as the harvest is from September to October, to be dependent upon whether the lessees will or will not allow me to remain longer, is, in fact, to be obliged to leave. Finally, it being already done, no matter how, it is well. I think you will remember that Ramona has a piece of ground on the rancho, which I and my chiluren gave her some years since. I do not know what arrangement you will make with her. You tell me to write to you that you may see if we are angry. Why should we be angry? I think it would be nonsense, and at the same time unjust, to be angry about a thing which is past. I cannot be. Tell me when you will come with those gentlemen to deliver the rancho. I think you ought to come yourself to give the possession, for if they come alone I do not know one of them, and I do not know what they will do. * * * Your affectionate sister, Rafaela Rodriguez." In her letters of September 18th. 1866, December 19th, 1866, August 8th, 1867, and September 26th, 1867, Rafaela speaks of having been looking for a piece of land from the time the rancho was rented, and of Antonio's application to Mr. Branch for this purpose; of the refusal by the Steeles to allow them to occupy more than 12 acres of the planting ground; of her regret that Jacinto had not reserved the small piece of ground belonging to Raimunda, (Ramona;) of her depression of spirits as the time for leaving approached; of her application to Mr. Steele to rent the house for another year, and of his willingness to do so at the rate of $120 per annum. The testimony shows that this arrangement was, in fact, made. In none of these letters is there the slightest intimation of any interest in the land retained by the family, or of any violation by Jacinto of any understanding or trust by which he was bound.

It will be remembered that at the time the deed was signed by the other members of the

family, Ignacio was absent. On the 16th March, 1865, he writes as follows to Jacinto: "I have received your esteemed letter of the 14th of the present month, in which you say to me that you hope that I will transfer by sale to you my right in the rancho of 'Corral de Piedra,' as all the rest of the family had transferred by sale their rights to you. I assure you that I will do the same as the rest of the family so soon as I see you, which I think, at the latest, will be in April or May, at the place—since here nothing can be done for want of a notary public; but if there were a notary public here, I would with all my heart transfer by sale my right to you, like all the rest of the family. Do not think that I would sell to any one else, although the whole world were offered me. * * * Your affectionate nephew, Jose Ignacio Villa." Certainly no one would suspect that the writer of this letter intended to offer to execute merely a mortgage, or that he was driven by necessity and the exactions of a rapacious creditor to assent to an unconscionable bargain. These letters disclose the real nature of the transaction. They dispel all suspicion as to fraud, accident, or mistake, in the execution of the deed. It was intended to operate according to its terms, and from the moment of its execution Jacinto is treated as the owner of the land, with the absolute right to dispose of it. If, as Ramona testifies, it was understood that the family were to be consulted before the sale was concluded, that understanding was fulfilled, for Rafaela was apprised of the offer of the Steeles before the lease was made, and informed of its execution three days after the papers were signed. She makes no objection, either that the signatures of the family were necessary, or to the terms of the contract, except only to that part which provided for her residence on the place for one year. Had they both been aware that Jacinto was fraudulently violating the agreement upon which the deed was made, it is difficult to account for the entire absence of concealment on his part, or of complaints and reproaches on her's. But her conduct and that of the family was as significant as the language of the letters. The Steeles were suffered to take possession without a word of protest, or any intimation of the rights now set up. They were permitted to make the valuable improvements required by the lease, (amounting in value to about $5,000 a year.) Several of the sons entered into their employ, and a lease was finally procured from them for the house and grounds the family were occupying. For more than a year the rights now set up were either concealed or unsuspected. When and by whom they were first suggested, and what was the origin of this litigation appears from Rafaela's letter of November 19, 1867: "I will now tell you what there is in relation to the rancho. Do not be alarmed; there is nothing done yet; and I will inform you of what they wish to

do." "The owner of the rancho of Guadalupe came yesterday to make me a proposition. He tells me that if I am willing to give him my signature and those of my children, selling all the rights we have in the rancho of Corral de Piedra to him for a much better price than that which Mr. Steele pays you, paying you all the money you have given for the rancho, and the interest of the money from the time you have loaned money on the rancho. They say I can do this. They have looked at the record of the deed which we gave you, and the lawyer, Van Ness, says that the deed which we made to you is only to secure your money, and not to pay my interest on the money which you had on the mortgage, and that I, having the money, can pay the same and the property remain in my hands. They also say that if this is done you will have no responsibility. They only desire to do so out of consideration for the family. This business is between Cappe, the owner of the Guadalupe, Van Ness and another lawyer. These gentlemen have made me this suggestion that the money which you have given on the rancho is $10,000 or $12,000, and that at the end of the five years of the contract with Messrs. Steele, it is very likely the interest of the money will amount to the $20,000, and then that the family will be left to perish. Recently a gentleman offered Steele $50,000 for the rancho, which he refused to accept, and as time passes these lands increase value on account of the immigration of the people who are to come. This is the reason why they say that for so small a sum Steele will remain with the rancho when you and we might enjoy $40,000 or $50,000, which is what he proposes to pay me,—the said gentleman who desires to buy the rights to the rancho. Mr. Van Ness also says that, according to the contract you have with Steele, the rancho will remain with him in any event. That it will matter little to him whether he fences the rancho or not within the time he has for buying it, and that you have no right to refuse to fulfil the contract, although Steele should refuse to comply with the terms of the same. But in all this they tell me, what can I do? I said that I believe we had no right, and if we had any, to do that which they wish, I have to advise with you in relation thereto; and according to your opinion, if you asked me to do it. Well, and if not, I did not wish to do anything without your approval. All this is under much secrecy, and according to what you think of the same you will answer me whatever it be. Do not think that we will do any unless you should wish it. * * * Your sister, Rafaela Rodriguez." This letter not only shows when and how the idea first entered the mind of Rafaela, that the deed to her brother could be made out to be a mortgage; it also contains the expression of her disbelief in the existence of the rights which were attributed to her. It·cannot be said that she was ignorant and illiterate,

for her correspondence shows her to have possessed unusual intelligence for a person in her condition. The question was one of fact and not of law, and had she known that the deed was executed merely as a security for the debt due her brother, as she would now have us believe, some allusion to or recognition of that fact must have fallen from her. Certainly she did not then dream of charging her brother with having fraudulently, and contrary to his agreement. disposed of property as his own, which he held only as a security. The overture thus made to Jacinto to unite in a scheme to avoid the fulfillment of his contract with the Steeles, he seems to have declined. From all this testimony, the facts of the case clearly appear.

The deed was executed, not as a mortgage, but in payment of the debt due to Jacinto. It was executed voluntarily, and as the best, if not the only means, of preventing the property from being sold under the hammer, but with the expectation that, if more could be realized for it than was necessary to repay Jacinto, the surplus would be given to the family. But, if additional evidence were wanting to show that the deed was not intended as a mortgage, it will be found in the fact that the previous indebtedness was paid and extinguished.

In Conway v. Alexander, 7 Cranch [11 U. S.] 218, Mr. Chief Justice Marshall says: "But as a conditional sale, if really intended, is valid, the inquiry in every case must be, whether the contract in the specific case is a security for the repayment of money, or an actual sale. In this, the form of the deed is not in itself conclusive either way. The want of a covenant to repay this money is not complete evidence that a conditional sale was intended, but it is a circumstance of no inconsiderable importance. If the vendee must be restrained to his principal and interest, that principal and interest ought to be secure. It is, therefore, a necessary ingredient in a mortgage that the mortgagee should have a remedy against the person of the debtor. If this remedy really exists, its not being reserved in terms will not affect the case. But it must exist in order to justify a construction which overrules the express words of the instrument." This decision has been followed in numerous other cases. Glover v. Payn, 19 Wend. 521; [Holmes ,v. Grant,] 8 Paige, 243. See cases collected in 3 [White & T.] Lead. Cas. Eq. 636 et seq. "It necessarily follows," says the learned editor, "that when a conveyance is in satisfaction of a precedent debt, it cannot take effect as a mortgage, although containing a clause for redemption, because the previous debt being extinguished, and no new one created, one of the essential attributes of a mortgage is wanting." And for this he cites numerous authorities.

In the case at bar, the deed, after reciting the note, and other indebtedness in consideration of which it is made, further recites: "And in further consideration that the party of the second part cancel and discharge said note and mortgage herein before referred to, and the parties of the first part from any and all the liabilities, debts, and sums of money hereinbefore mentioned as having been paid or advanced by the party of the second part, the parties of the first part have granted, bargained, sold," etc., etc. The proof shows that the mortgage was cancelled of record on the following day. The note does not seem to have been demanded or surrendered, but all liability upon it was extinguished by the recitals in the deed and the cancellation of the mortgage. It was retained probably in order that, if Jacinto should be called on to fulfill his promise to give to the family any surplus over and above the debt due, he might have the means of establishing its amount. From the date of the deed the debt appears to have been treated by all parties as extinguished. No payment of principal or interest was made or demanded, and no reference to it is contained in the correspondence until the letter of November 19th, 1867, nearly four years afterwards. My conclusion from all the evidence in the case is, that the deed and the testimony of Jacinto disclose the true nature of the transaction, viz., that the land was conveyed not in security for, but in satisfaction and extinguishment of, the precedent debt, but under the expectation founded .on Jacinto's assurances that any surplus of the price at which it might be sold, over and above the amount necessary to reimburse Jacinto, would be, by the latter, appropriated to the benefit of the family. Whatever trust, therefore, was created referred to the proceeds. It did not attach itself to the land or in any way impair the right of Jacinto to dispose of it.

In the view I take of the evidence it is not necessary to consider at length the title or right acquired by the Steeles. That they contracted without notice of the alleged equities in the grantors of the complainant, and on the faith of the recorded title, is beyond controversy. The attempt to fix on them a constructive notice, by evidence. of loose rumors and conjectures, was wholly unsuccessful. "Vague reports and rumors from strangers," says Story, Circuit Justice, "are not a sufficient foundation on which to charge a purchaser with notice of a title in a third person." Flagg v. Mann, [Case No. 4,847.] In Wilson v. Wall, [6 Wall. (73 U. S.) 91,] says the supreme court: "The question, then, when it is sought to affect a purchaser with constructive notice, is not whether he had the means of obtaining, and might by prudent caution have obtained, the knowledge in question, but whether the not obtaining it was an act of gross or culpable negligence."

As the Steeles, by the contract to sell, merely acquired an equitable right, it was

conceded at the argument that they were not within the general rules which protect bona fide purchasers, without notice. It may deserve consideration, however, whether under the recording statutes of this state he who has acquired the right to demand the conveyance of the legal title on the payment of a sum of money, by a contract entered into with the apparent owner, is not entitled to the same protection as he who has actually obtained a deed. The effect of those statutes is not merely to affect all persons with notice of every recorded deed and to avoid as against subsequent incumbrances. They also operate as a designation of a place, to which all the world is invited by law to resort, for complete and reliable record evidence of the titles to estates. Whoever, therefore, voluntarily and with full knowledge of its purport executes a deed, knows that it will necessarily be placed on record, and he authorizes the grantee to proclaim himself, in the most emphatic manner, to the world as possessed of the estate which the deed purports to convey. If, in fact, the real title, or right of ownership, is in the grantor, the latter consents to the proclamation of a falsehood, and the making of a deceptive record; and, as between himself and any person who, on the faith of the recorded title and without notice, has dealt with the apparent owner, it seems most agreeable to justice and the analogies of the law to hold the former bound by the acts of the agent or trustee to whom he has furnished the means of deception. A contract for the sale of land is by the same statutes regarded not merely as a personal contract on the part of the contractor, but as a covenant attached to and running with the land; and, if recorded, it will bind the land, and may be enforced against any subsequent incumbrance. He who has entered upon land under a contract for the conveyance of the title, is popularly considered the real owner as much as if he had obtained a deed and paid the purchase money; and there would seem to be no good reason for refusing the protection which equity would unhesitatingly have afforded him had the transaction assumed the latter form. Nor are his rights fully secured by exacting from the owner of the latent equity a return of whatever of the purchase may have been paid or money expended in betterments. He may have fixed his home upon the land, and it may have acquired for him a pretium affectionis, or it may have risen greatly in value, as in the case at bar, and this increase is the fair and legitimate fruit of his sagacity or his good fortune, to which he is justly entitled. To allow the equitable owner to lie by, and at his will to enforce or avoid the contract, as his interest may dictate, is to give him an unjust advantage to which his own negligence or blind confidence, in suffering a person not the true owner to appear as such upon the records, does not seem to entitle him. It is not necessary, however, to pass upon the point, as, for the reasons already stated, I think the bill must be dismissed.

[NOTE. This decree was reversed by the supreme court in Villa v. Rodriguez, 12 Wall. (79 U. S.) 323. Mr. Justice Swayne, in delivering the opinion, said: "The lessees and their assignees insist that they are bona fide purchasers without notice. This proposition cannot be maintained. * * * The doctrine invoked has no application where the rights of the vendee lie in an executory contract. It applies only where the legal title has been conveyed and the purchase money fully paid. * * * To give validity to such a sale by a mortgagor, it must be shown that the conduct of the mortgagee was, in all things, fair and frank, and that he paid for the property what it was worth. He must hold out no delusive hopes; he must exercise no undue influence; he must take no advantage of the fears or poverty of the other party. Any indirection or obliquity of conduct is fatal to his title. Every doubt will be resolved against him. Where confidential relations and the means of oppression exist, the scrutiny is severer than in cases of a different character. The form of the instruments employed is immaterial. That the mortgagor knowingly surrendered and never intended to reclaim is of no consequence. If there is vice in the transaction, the law, while it will secure to the mortgagee his debt, with interest, will compel him to give back that which he has taken with unclean hands. * * * The terms exacted for the loan by Rodriguez were harsh and oppressive. The condition of the widow and orphans might well have touched his kindred heart with sympathy. It seems only to have whetted his avarice. Two per cent. a month—and this, if not paid as stipulated, to be compounded—was a devouring rate of interest. It was stipulated that the further advances should bear interest at the same rate. He demanded an adjustment when, from the failure of the crops and other causes, the property was greatly depressed, and he knew the widow and her children had no means of payment. The alternatives presented were an absolute conveyance of the property or a foreclosure and sale under the mortgage. He was anxious to procure the deed, and exulted when he got it. The debt and advances, with the interest superadded, were much less than the value of the property. * * * The testimony of Rodriguez alone is sufficient to turn the scale against him. He cannot repudiate the assurances upon which his grantors were drawn in to convey. To permit him to do so would give triumph to iniquity. The facts indisputably established bring the case clearly within those principles by the light of which, in determining the rights of the parties, the judgment of this court must be made up. The complainant stands in the place of those from whom he derives title. He is clothed with their rights, and is entitled to redeem six-sevenths of the premises upon paying that proportion of the mortgage debt and interest. The former must be held to include the amount advanced, as well as that represented by the note, and the latter be settled by the terms of the contract and the law of California."]